UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-v.-<br><br>R.R., MALE JUVENILE,<br><br>Defendant. | S 23 Cr. 203 (JHR)<br><br>OPINION & ORDER (**SEALED**) |

JENNIFER H. REARDEN, District Judge:

On April 18, 2023, Defendant R.R. was indicted as an adult for racketeering conspiracy pursuant to 18 U.S.C. §1962(d).[1] ECF No. 1(Indictment). R.R. was indicted along with two adult co-defendants, Wander Rivera and Edward Perez. *Id.* On October 26, 2023, the Government filed a sealed superseding juvenile information charging R.R. as a minor under the Juvenile Justice and Delinquency Prevention Act (the "JDA"), 18 U.S.C. § 5031 *et seq*, with five counts of juvenile delinquency, as follows:

(1) murder in aid of racketeering. in violation of 18 U.S.C. §§ 1959(a)(1) and 2;

(2) murder through use of firearm, in violation of 18 U.S.C. §§ 924(j) and 2;

(3) discharge of firearm, in violation of 18 U.S.C. §§ 924(c)(i),(ii),(iii), and 2;

(4) attempted murder and assault with a dangerous weapon, in violation of 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), 1959(a)(6), and 2; and

(5) a second count of discharge of firearm, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii), and 2.

*See* October 26, 2023 Sealed Signed Superseding Juvenile Information (Superseding Information).[2] The same day, the Government moved to transfer R.R. to adult status under the

[1] On December 11, 2025, the Government filed an S2 Superseding Indictment that extends the end date of the conspiracy and adds a racketeering activity. ECF No. 147 (Superseding Indictment).

[2] All proceedings and documents in this case have been sealed to the extent that they pertain to alleged acts of juvenile delinquency. *See* 18 U.S.C. § 5038(a) (providing that, "[t]hroughout and upon the

discretionary transfer provisions of the JDA, *see* 18 U.S.C. § 5031 *et seq.* October 26, 2023 Sealed Motion to Transfer (Mot. or Motion to Transfer); October 26, 2023 Memorandum of Law in Support of Motion to Transfer (Memo.). The Court held a hearing on the Motion to Transfer on October 21, 2025 (the "Transfer Hearing"). *See generally* October 21, 2025 Sealed Transfer Hearing Transcript (Transfer Hr'g Tr.). For the reasons set forth below, the Court grants the Motion to Transfer and transfers R.R. to adult status with respect to all five counts in the Superseding Information.

## BACKGROUND

### A. Factual Background[3]

The offenses charged in the Superseding Information stem from R.R.'s participation in the A-Town gang, a subset of the Trinitarios gang based in the University Heights section of the Bronx. Memo. at 4. The Trinitarios often work "to commit crimes together" with the Shooting Boys gang, *id.*, "a criminal organization whose leaders, members, and associates engage[] in, among other things, acts involving murder, assault robbery, narcotics, trafficking and wire fraud." Superseding Indictment at 1. The Shooting Boys enterprise operates principally in and around the Bronx, and Manhattan, New York. *Id.*

---

completion of the juvenile delinquency proceeding, the records shall be safeguarded from disclosure to unauthorized persons," and listing specific circumstances under which "the records shall be released to the extent necessary").

[3] "The allegations detailed in this section are taken from the Government's motion papers and supporting documents and from the evidence presented at the [October 21, 2025] hearing." *United States v. O*, No. 15 Cr. 608-10 (KPF), 2016 WL 4197597, at *1 n.2 (S.D.N.Y. Aug. 8, 2016) (*A.O. Juvenile*). "On a transfer motion, the court must 'assume that, for the purposes [of] the transfer hearing, the juvenile committed the offense charged in the [Superseding] Information.'" *Id.* (quoting *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995) (*Nelson I*)); *see also United States v. Juv. Male No. 2*, 761 F. Supp. 2d 27, 30 n.4 (E.D.N.Y. 2011) (*Juvenile Male No. 2*) ("The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence.").

On or around June 21, 2021, R.R. "knowingly murdered and aided and abetted the murder of Milton Grant, in the vicinity of 175 Dyckman Street in Manhattan," Superseding Information at 5, and the "shooting of Randal Chacon." Transfer Hr'g Tr. at 6:22. Earlier that day, R.R. met with three members of the Shooting Boys in the vicinity of University Avenue and Fordham Road. Memo. at 4. The gang decided to drive around the area's nightclubs to target people to rob, and R.R. suggested an after-hours nightclub in Manhattan where they expected to find individuals wearing expensive jewelry who were exiting the club. *Id*. at 5. R.R. and his accomplices drove past a black BMW occupied by Mr. Grant that was parked in front of 175 Dyckman Street, identified what they believed to be expensive jewelry on Mr. Grant and Mr. Chacon, and targeted them for robbery. *Id.* R.R. was armed with a Smith & Wesson 9MM pistol that was equipped with a silencer and laser sighting capability. *Id*.

As seen on surveillance footage "put together by NYPD for the purposes of presentment to the Court," Transfer Hr'g. Tr. at 8:12-13, R.R. and "his three accomplices physically assault[ed] Mr. Chacon," and R.R. individually "confront[ed] Mr. Grant, who [wa]s sitting behind the wheel of his car."[4] *Id.* at 6:24-25. R.R. "fire[d] a single gunshot at close range into the head of Mr. Grant, killing him." Transfer Hr'g Tr. at 7:1-2. The car then rolled onto the sidewalk and crashed into a storefront. *Id.* at 7:3-4. Before following the car, R.R. "s[aw] Mr. Chacon running away and attempting to flee, and fire[d] multiple gunshots at him." *Id.* at 7:6-7. Mr. Chacon was struck in the groin by one of the gunshots fired by either R.R. or his fellow gang member. Memo. at 5. Next, R.R. doubled back to Mr. Grant's car, "enter[ed] the car, remove[d] the wristwatch from [Mr. Grant's] hand, and then fle[d]." Transfer Hr'g Tr. at 7:7-8. After the shooting, the three assailants ran back to the waiting car and drove away. Memo. at 5.

[4] According to the Government, "multiple cooperating witnesses" have identified R.R. as the individual in the surveillance videos. Transfer Hr'g Tr. at 24:24.

The following day, R.R. and one of the other gang members who participated in the robbery brought the stolen jewelry to an individual the gang worked with to fence the stolen property, for which they received $35,000. *Id.* at 6.

**B. Procedural Background**

On April 18, 2023, R.R. was indicted as an adult for racketeering conspiracy, pursuant to 18 U.S.C. §1962(d), for his involvement with the Shooting Boys gang. *See generally* Indictment. On October 26, 2023, the Government filed the Superseding Information, charging R.R. with the aforementioned acts of juvenile delinquency. *Supra* at 1. That same day, the Government filed its Motion to Transfer pursuant to 18 U.S.C. § 5032, *see generally* Mot., and the Court held an arraignment proceeding. At the proceeding, the parties requested a 60-day adjournment, to January 4, 2024—the same day as the next conference in the adult case—"to allow [] [them] to continue their discussions." October 26, 2023 Sealed Hr'g Tr. at 6:8-11. The Court set the conference and excluded time through January 4, 2024 to "allow the parties to continue . . . talking with each other." *Id.* at 8:23-24.

**1. R.R.'s Initial Evaluations**

On or around November 17, 2023, before the next conference, counsel for R.R. expressed concern that R.R. was "not at all himself," had reported [redacted] and "was unable to answer basic questions." November 17, 2023 Sealed Def. Ltr. The Court directed that a "licensed physician at the [Metropolitan Detention Center (MDC)] immediately examine [R.R.]" and also asked the parties to "consult to determine whether a competency examination of [R.R.] should be ordered." November 18, 2023 Sealed Order. On December 4, 2023, defense counsel wrote that, "[u]pon review of the defendant's medical records from MDC-Brooklyn and based on [their] interactions with him, defense counsel d[id] not believe that a competency examination [wa]s needed." December 4, 2023 Sealed Def. Ltr. Defense counsel nevertheless retained

licensed clinical psychologist Dr. Hersha Diaz to examine R.R., "in order to gain insight into the quality of his mental health and cognitive functioning, assess his current behavioral and social functioning, and assist with treatment planning." January 29, 2024 Report by Dr. Hersha Diaz (Diaz Report) at 1.

From December 2023 to March 2024, R.R. was evaluated several times, both by Dr. Diaz and by psychologists at MDC. During that time, although R.R. was placed on suicide watch twice, "the doctor [at MDC] concluded that the defendant was making these statements for 'secondary gain' and that his risk of acute suicide was 'low.'" January 31, 2024 Sealed Def. Ltr. at 2. Defendant was prescribed medication for adjustment disorder with depressed mood. R.R.'s MDC Medical Records at 2 (annexed to February 7, 2024 Sealed Gov't Ltr.). On February 7, 2024, when seen by an MDC psychologist, R.R. "denied repeatedly any suicidal/homicidal ideations." February 7, 2025 Sealed Gov't Ltr. (internal quotations omitted). Meanwhile, defense counsel expressed concern about the medical care at MDC and "request[ed] that the Court hold a hearing where appropriate medical personnel from the MDC attend and be able to speak to [R.R.'s] care." January 31, 2024 Sealed Def. Ltr. at 2. The Government opposed that application on the ground that "MDC medical staff should not be hauled into court to defend their medical judgments" "every time [a] defense expert" (here, Dr. Diaz) "proffers a different opinion." February 15, 2025 Sealed Gov't Ltr.

On March 28, 2024, defense counsel informed the Court that, "after meeting with a mental health expert, [their] concerns regarding [R.R's] mental health ha[d] been allayed." ECF No. 50 (March 28, 2024 Def. Ltr.). Defense counsel also reported that "[t]he government ha[d] made a plea offer to [R.R.,] which [counsel] intend[ed] to discuss with him," and that they expected those discussions to take approximately six weeks. *Id.* at 2. Counsel requested that any further proceedings be adjourned until early May 2024. *Id.*

**2. Change of Counsel and Motion to Transfer Scheduling**

On October 3, 2024, the parties in the adult proceeding requested a date for trial, after "nothing ha[d] come to fruition" with respect to a plea deal for the Defendants in that case. ECF No. 63 (October 3, 2024 Hr'g Tr.) at 3:2-4. The Court scheduled trial in the adult proceeding for May 27, 2025. *See id.* at 7:4. The Court also set a hearing on the Government's Motion to Transfer for January 14, 2025. *See* October 9, 2024 Sealed Def. Ltr.

On November 13, 2024, counsel for R.R. moved to withdraw because "communications between [counsel] and [R.R.] ha[d] fully broken down," and R.R. "c[ould not] and w[ould] not meaningfully communicate with [counsel] regarding his case." ECF No. 68. The Court scheduled a substitution of counsel proceeding for November 19, 2024. ECF No. 69. At the hearing, the Court appointed new counsel for R.R. for both the adult and juvenile cases. ECF No. 74 at 39:1-4. In light of the change of counsel, as well as an extension request on consent, December 6, 2025 Sealed Def. Ltr., the Court reset R.R.'s deadline to respond to the Motion to Transfer to March 10, 2025 and the Government's deadline to reply to March 20, 2025. December 26, 2024 Sealed Order. The Court scheduled a hearing on the Motion to Transfer for April 15, 2025 and reserved May 5, 2025 for trial in the juvenile case. *Id.*

In connection with the Motion to Transfer, the Government retained Dr. Cheryl Paradis, a licensed forensic psychologist, to examine R.R. Dr. Paradis evaluated R.R. on March 1, 2025 and produced a report on March 20, 2025. March 20, 2025 Report by Dr. Cheryl Paradis (Paradis Report). Dr. Paradis's report addressed "whether [R.R.] was suffering from a mental disease or defect which renders him mentally incompetent" and "the factors related to the decision of transferring his case to adult status." *Id.* at 1. The defense retained Dr. Jessica Pearson to evaluate R.R. Dr. Pearson met with R.R. but did not produce a report. March 17,

2025 Sealed Motion to Request a Psychiatric Or Psychological Evaluation And Hold a Hearing to Determine His Competence to Stand Trial (Competency Motion) at 7.

**3. R.R.'s Competency Motion**

As detailed in the Court's October 9, 2025 Sealed Order finding Defendant competent to stand trial (the "Competency Opinion"), during a status conference on March 11, 2025, defense counsel raised concerns about R.R.'s "competence, [and] his ability to comprehend what exactly is happening." March 11, 2025 Sealed Hr'g Tr. at 4:14-15. Pursuant to the Court's March 12, 2025 Sealed Order, on March 17, 2025, R.R. filed his Competency Motion requesting a psychiatric evaluation and a hearing to determine competence to stand trial. The Court granted R.R.'s request and directed the parties to seek to agree on an expert. April 15, 2025 Sealed Hr'g Tr. at 16:6-7. On April 23, 2025, the parties informed the Court that they were unable to agree and proposed competing experts for consideration. April 23, 2025 Sealed Letter from Government. The Court appointed Dr. Ziv Ezra Cohen, a forensic psychiatrist not proposed by either party, to conduct a competency evaluation of Defendant pursuant to 18 U.S.C. §§ 4241(b) and 4247(b). May 22, 2025 Sealed Order. Neither party objected to the appointment of Dr. Cohen. *See* May 5, 2025 Sealed Order.

Dr. Cohen evaluated Defendant on July 8, 2025 and produced a report (the "Cohen Report") on August 4, 2025. The Cohen Report stated that Defendant was "competent to stand trial" because "[he] demonstrates a factual and rational understanding of the legal process, is able to comprehend the roles of courtroom participants, understands the charges and potential consequences he faces, and can assist his attorney in preparing his defense." Cohen Report at 12. The Court held a competency hearing on September 12, 2025 (the "Competency Hearing"), at which the defense called Dr. Cohen and the Government called Dr. Paradis. After hearing from both parties and both experts and reviewing the extensive medical record, including MDC

medical records, as well as the reports submitted by Drs. Cohen, Paradis, and Diaz, the Court determined that R.R. was competent to stand trial because he "ha[d] both 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'a rational as well as factual understanding of the proceedings against him.'" Competency Opinion at 10 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

**4. Motion to Transfer Briefing and Hearing**

R.R. filed his opposition to the Motion to Transfer on October 6, 2025 (Opp.), and the Government filed its reply on October 14, 2025 (Reply). The Court held the Transfer Hearing on October 21, 2025, at which Dr. Paradis testified. The defense did not call any witnesses.

In its opening memorandum of law in support of the Motion to Transfer, filed on October 26, 2023, the Government had requested an order "direct[ing] the United States Probation Office to prepare a report concerning R.R. to assist in assessing whether transfer to adult status [wa]s in the interest of justice." *See* Memo. at 2 (citing 18 U.S.C. § 5037(e)). On October 17, 2025, prior to the Transfer Hearing, the Court directed the parties to "confer and submit a letter or letters informing the Court of their position(s) regarding any need for such a report at this juncture." October 27, 2025 Sealed Order. The Government argued that "an additional report from the United States Probation Office would be both duplicative and unnecessary," in light of the examinations conducted and the expert reports submitted by "three independent experts" since the time of its request. October 20, 2025 Sealed Gov't Ltr. While acknowledging that "such a report [was]s within the Court's discretion," the defense contended that it could "certainly assist the Court in evaluating the six statutory factors enumerated in 18 U.S.C. § 5032." October 20, 2025 Sealed Def. Ltr. The Court determined that, "at this point[,] there [was] a robust enough record" that a report from the Probation Office was not needed. Transfer Hr'g Tr. at 5:17-19.

**LEGAL STANDARDS**

The JDA provides that "a juvenile fifteen years and older alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony," 18 U.S.C. § 5032, "may be prosecuted as an adult if the Attorney General moves to transfer the juvenile for adult criminal prosecution, and a district court 'finds that it is "in the interest of justice" to grant a transfer.'" *A.O. Juvenile*, 2016 WL 4197597, at *4 (quoting *Nelson I*, 68 F.3d 583 at 588). The United States Attorney for this District, "with the delegation of the Attorney General of the United States and pursuant to Title 18, United States Code, Section 5032," confirmed that the charges in the Superseding Information were "felony crimes," April 13, 2023 Sealed Certification to Proceed Under the Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. § 5031 *et seq***.**, and "certifie[d] . . . that jurisdiction over the defendant as a juvenile committing an act of juvenile delinquency [wa]s proper in this Court in accordance with Title 18, United States Code, Section 5032." *Id.*; *see also* Mot. "Given the presumption that exists in favor of juvenile adjudication, the burden is on the Government to establish, by a preponderance of the evidence, that transfer is warranted." *A.O. Juvenile*, 2016 WL 4197597, at *5.

In considering the Motion to Transfer, the Court weighs six factors: (1) "the age and social background of the juvenile;" (2) "the nature of the alleged offense;" (3) "the extent and nature of the juvenile's prior delinquency record;" (4) "the juvenile's present intellectual development and psychological maturity;" (5) "the nature of past treatment efforts and the juvenile's response to such efforts;" and (6) "the availability of programs designed to treat the juvenile's behavioral problems." 18 U.S.C. § 5032. "[T]he statutory factors have been identified primarily because of their impact on the juvenile's rehabilitative potential." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) (*Nelson II*). "While rehabilitation is a priority, the courts are not required to apply the juvenile justice system . . . when it would likely prove to be

nothing more than a futile gesture." *Id.* (alterations and citation omitted). "The desire to encourage rehabilitation must be balanced against the 'need to protect the public from violent and dangerous individuals.'" *United States v. Doe*, 74 F. Supp. 2d 310, 316 (S.D.N.Y. 1999) (*Doe I*) (quoting *United States v. Juv. Male No. 1*, 47 F.3d 68, 71 (2d Cir. 1995)), *aff'd sub nom. United States v. Ramirez*, 297 F.3d 185 (2d Cir. 2002). "In deciding whether to transfer a juvenile defendant to adult status, the district court need not accord each of the six factors equal weight—the court may balance the factors in any manner it feels appropriate." *Nelson II*, 90 F.3d at 588.

## DISCUSSION

### A. Age and Social Background

In assessing a juvenile's age and social background, "'[t]he Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing.'" *A.O. Juvenile*, 2016 WL 4197597, at *5 (quoting *United States v. Juv. Male*, 844 F. Supp. 2d 312, 316 (E.D.N.Y. 2011) (citing *Nelson I*, 68 F.3d at 589)). "[A] crime committed when the juvenile was 'very young' or that was 'an isolated indiscretion' supports transfer less, whereas conduct that occurs closer to age 18 or over a prolonged period of time supports transfer more." *United States v. C.F.*, 225 F. Supp. 3d 175, 184 (S.D.N.Y. 2016).

R.R. was born on September 17, 2004. Memo. at 12. As of June 21, 2021, the date of the alleged offenses, R.R. was three months shy of 17 years old. Thus, R.R. was a juvenile within the definition of 18 U.S.C. § 5031 as to all Counts in the Superseding Information.

"At the time of the offense[s]," *A.O. Juvenile*, 2016 WL 4197597, at *5 (quotations and citation omitted), R.R. was closer to the age of majority than to the age of fifteen. *See* 18 U.S.C. § 5032. Moreover, as described below, R.R. "did not have an isolated episode of violent conduct

at a very young age, nor did he have a smattering of low-level criminality punctuated by a single violent episode when he was close to the age of majority." *A.O. Juvenile*, 2016 WL 4197597, at *6. Instead, R.R. has been involved with the Shooting Boys "from at least in or around 2018," when he was 14 years old, *see* Superseding Indictment at 3, "up to and including in or about September 2025," and has engaged in "multiple acts involving murder," "multiple acts involving robbery," extortion, wire fraud, "witness retaliation," and "multiple offenses involving the distribution of controlled substances, including heroin, cocaine." Superseding Indictment at 3-5.

Further, "at the time of the [T]ransfer [H]earing," *A.O. Juvenile*, 2016 WL 4197597, at *5 (quotations and citation omitted), R.R. was just over the age of 21. "[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application." *Nelson I*, 68 F.3d at 589. "[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." *Id.* at 589 (internal quotations and citation omitted). Indeed, "after ha[ving] been placed in federal custody," and "ha[ving] received counseling opportunities in MDC," R.R. committed several disciplinary infractions. Transfer Hr'g Tr. at 13:14-16. First, on or around December 3, 2023, R.R. "participat[ed] in a [] [] brutal stabbing in MDC." *Id.* at 13:12-13; *see also* Gov't Ex. 13[5] (Bureau of Prisons Records) at 1. Footage from MDC reviewed at the Transfer Hearing shows that R.R. "snuck up on this individual," "turned and stabbed him in the chest," and then "continued to chase him, unrelentingly stabbing and slashing at him." Tr. Hr'g. Tr. at 14:4-7; Gov't Exs. 4-6. R.R. "wasn't provoked," and the attack, which "lasted several minutes," was

[5] "Gov't Ex." refers to the Government's exhibits that were admitted into evidence at the Transfer Hearing.

"not a failure of impulse control." Tr. Hr'g. at 16:7-8;16. R.R. believed that this individual was "a member of a rival gang" and "a cooperator with the government." *Id.* at 14:11-13.[6]

Second, on or around February 22, 2025, at age 20, R.R. "assaulted another MDC inmate … stabbing the victim in the torso with a homemade weapon." *Id.* at 17:2-5; Gov't Ex. 13 at 39-41 (Bureau of Prisons incident report stating that R.R. "was involved in a serious assault" where he was "observed striking [another] inmate" "with a sharpened weapon" and was "appropriately charged" during an "institutional disciplinary process"). Finally, "as recently as September 6[, 2025]," "MDC staff found [R.R.] once again in possession of a 7-inch sharpened piece of metal." Tr. Hr'g Tr. at 17:23-25-18:1; Gov't Ex. 13 at 149 (reporting that "a 7-inch piece of metal, sharpen[ed] to a point[,] was found on" R.R.). R.R.'s most recent infraction took place on September 6, 2025, just days before the Competency Hearing and less than two weeks before his 21st birthday. Tr. Hr'g Tr. at 17:24. "Each incident underscores the same point," Tr. Hr'g at 18:10: R.R. has not benefitted from rehabilitation in federal custody, and it would be difficult at [his current] age to "reform [his] values and behavior." *Nelson I*, 68 F.3d at 589; *see A.O. Juvenile*, 2016 WL 4197597, at *6 ("[T]he fact that [defendant] persisted in violent criminal conduct … after turning 18 lessens the likelihood of his rehabilitation."); *United States v. Sealed Defendant 1*, 563 F. App'x 91, 92 (2d Cir. 2014) (affirming decision to transfer where the district court had given "careful consideration to [the juvenile's] rehabilitative potential") (summary order).

Additionally, pursuant to 18 U.S.C. § 5037(c)(2)(A)(i)-(ii), "[t]he term for which official detention may be ordered . . . in the case of a juvenile who is between eighteen and twenty-one years old," may not extend beyond "the lesser of (i) five years; or (ii) the maximum of the

[6] A separate case relating to this assault is pending before the Honorable Lewis J. Liman. *United States v. Ramon Rodriguez*, No. 24 Cr. 417 (S.D.N.Y.).

guideline range." The Court finds that R.R.'s "current age of [twenty-one] years . . . which would allow him only five years in a [] detention facility to rehabilitate himself, weighs in favor of transfer." *United States v. Juv. Male*, 844 F. Supp. 2d 333, 339 (E.D.N.Y. 2012) (*Juvenile Male 2012*) (citing18 U.S.C. § 5037(c)(2)(A)(i)-(ii)); *see also United States v. Doe*, 49 F.3d 859, 867 (2d Cir. 1995) (affirming decision to transfer where the defendant "was approximately 16 ½ years old at the time of the" alleged crime, and "the conduct with which he was charged did not occur either when he was very young or as an isolated indiscretion"); *United States v. Female*, 581 F. Supp. 3d 482, 492 (E.D.N.Y. 2022) (*Juvenile Female*) (determining that age favored transfer where, at the time of the offense, "the defendant was weeks away from her seventeenth birthday" and, at the time of the transfer hearing, "the defendant was approximately nineteen years").

"The Court also considers [R.R's] social background." *A.O. Juvenile*, 2016 WL 4197597, at *6. R.R. was born in the Dominic Republic and came to the United States at age six. Paradis Report at 3. He was raised by his mother, who worked long hours as a hairdresser in a salon. *Id.* R.R. has two older siblings and "does not have contact with his father or information as to his whereabouts." Diaz Report at 2. R.R. "was never in foster care or in a juvenile facility"; "Administration for Children Services was never called to investigate charges of abuse or neglect"; and "he was not homeless" and was "living with his mother at the time of the instant offense[s]." Transfer Hr'g Tr. at 37:23-25−38:1-2. Dr. Paradis observed that, in contrast to many defendants she has evaluated who "have had some kind of stress or trauma [] in their upbringing," R.R. experienced a fairly "typical upbringing." *Id.* at 38:6-8.

According to R.R.'s mother, R.R. achieved "typical developmental milestones," including with respect to walking and talking, and did not have "any learning difficulties or behavioral issues in school." Paradis Report at 3. R.R.'s mother "described him as being smart

and someone who could read well." Transfer Hr'g Tr. at 39:7-8. R.R. was not placed in "any kind of special education placement . . . which is an indication that someone has a learning or behavioral problem." *Id.* at 10-12.

"[T]hings started to change" for R.R. around middle school, where "there was often physical violence and bullying." Diaz Report at 2. R.R. reported to Dr. Diaz that he "anticipat[ed] being hit, hurt, or robbed throughout his middle and high school experience." *Id.* "For three years of [R.R's] high schooling, he [did not] pass[] … a single class," Transfer Hr'g Tr. at 66:24-25−67:1; *see also* Def. Ex. G (Bronx Leadership Academy Records), and "ultimately dropped out of school in the tenth grade at around age 15." Diaz Report at 2. This was shortly after R.R. became affiliated with the Shooting Boys gang in 2018, at age fourteen. *See* Superseding Indictment at 3. "R.R. also has [three] children" and separated "from the[] mother [of two of his children] prior to his arrest on the instant offense[s]." Paradis Report at 3. According to Dr. Diaz, after this breakup, R.R. [redacted]

While the Court acknowledges the challenges associated with R.R.'s childhood and school experiences, "[t]he relevant inquiry [] is whether this background suggests that [R.R.] will respond to rehabilitative efforts while being treated as a juvenile." *A.O. Juvenile*, 2016 WL 4197597, at *6. "[G]iven the defendant's continuing and long-term affiliation with his gang and the absence of" any adult figure mitigating that behavior, *Juvenile Male No. 2*, 761 F. Supp. 2d at

36, "the Court finds that the defendant's social background makes it highly unlikely that he could be rehabilitated in the short period of time before he would have to be released from [] custody under federal law." *Id.*

The Court "thus finds that the first factor weighs in favor of transfer." *A.O. Juvenile*, 2016 WL 4197597, at *6.

**B. The Nature of the Offenses Charged**

"There is no question, [and R.R. does not 'claim otherwise,' Opp at 6,] that the offense[s] charged in the [Superseding] Information [are] serious and extremely violent."[7] *Juvenile Male 2012*, 844 F. Supp. 2d at 341. As detailed in the Government's presentation at the Transfer Hearing, R.R. fired a "single gunshot at close range into the head of Mr. Grant, killing him," Transfer Hr'g Tr. at 7:1-2, and then returned to the car to remove "the watch from Mr. Grant's body." *Id.* 9:10. The crimes "involved some degree of premeditation" and were not reflective of an "impulsive crime." *Id.* at 47:7-8 (Dr. Paradis testifying regarding the nature of the crimes). "The heinous nature of the crime of intentional murder certainly may be a factor entitled to special weight." *Nelson I*, 68 F.3d at 590. "[R.R.] does not dispute the seriousness of the conduct alleged in … the [Superseding] Information, but rather suggests that the Court focus on the absence of detailed evidence concerning the hierarchy." *A.O. Juvenile*, 2016 WL 4197597, at *7. Specifically, R.R. contends that he "is not alleged to have taken a leadership or influential role in the charged crimes in order to trigger the statutorily authorized 'added weight.'" Opp. at 6. That factor "may [b]e appropriate when considering the motion to transfer with respect to . . . the [] charges involving group conduct," *A.O. Juvenile*, 2016 WL 4197597, at *7, such as Count

[7] The Government separately points to an incident eight days before the instant offenses, in which R.R. supposedly waited for someone outside of a nightclub, "chase[d] the individual," and "sho[t] the individual in the middle of the street." Transfer Hr'g Tr. at 11:10-14. The Court does not consider that alleged conduct in adjudicating this Motion.

One of the Superseding Indictment involving racketeering conspiracy, Superseding Indictment at 1. But R.R.'s "individual conduct" involving murder, including "the intentional shooting of two people[] . . . and the conscious decision to carry a firearm in connection with racketeering [] [] [] offenses," *A.O. Juvenile*, 2016 WL 4197597, at *7 (weighing defendant's individual conduct), was unquestionably "serious and extremely violent." *Juvenile Male 2012*, 844 F. Supp. 2d at 341. "Stated simply, given the seriousness of these offenses, [and] the fact that they involve [R.R]'s individual conduct . . . the Court finds this factor to be the most important in its analysis, and further finds that it weighs in favor of transfer." *A.O. Juvenile*, 2016 WL 4197597, at *7; *see also Nelson II*, 68 F.3d at 590 ("[W]hen a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors."); *Juvenile Male 2012*, 844 F. Supp. 2d at 341 ("An intentional murder such as the crime alleged here constitutes the type of 'particularly serious' crime that warrants weighing the nature of the offense more heavily than any of the other factors in the transfer analysis.").

**C. Prior Delinquency Record**

R.R. has one prior juvenile adjudication, from November 12, 2021: for criminal possession of a loaded firearm in violation of New York Penal Law Section 265.01-B-01, a Class E felony. Memo. at 16. R.R. was sentenced to 12 months' probation for this offense. *Id.* The Government also points to prior arrests for possession of a forged instrument, robbery in the second degree, and grand larceny in the fourth degree for which R.R. was not adjudicated. *Id.* at 17. The parties acknowledge that the "Second Circuit has not directly addressed whether unadjudicated conduct like prior arrests may be considered in evaluating a juvenile's prior delinquency record on a motion to transfer." *United States v. Doe*, 145 F. Supp. 3d 167, 185 (E.D.N.Y. 2015); Memo. at 17; Opp. at 6. "Ultimately, the Court need not resolve this dispute" because R.R.'s "prior adjudication[], which involve[s]," the possession of a loaded firearm just a

few months after the alleged offenses here, *see supra* at 3, appears to be related to similar activity that resulted in the instant crimes. *A.O. Juvenile*., 2016 WL 4197597, at *7. Accordingly, this factor also "weighs in favor of transfer." *Id.*

**D. Present Psychological Maturity and Intellectual Development**

"Courts have found that a juvenile's present intellectual development and psychological maturity support transfer where the juvenile is closer to average levels of intelligence and emotional or psychological maturity for the juvenile's age." *Id.* The Court has reviewed the report of, and heard testimony from, Government expert Dr. Paradis, who was retained in connection with the Motion to Transfer and to assess R.R.'s competency. In connection with analyzing R.R.'s psychological maturity and intellectual development, the Court also notes the conclusions reached by Court-appointed expert Dr. Cohen, who evaluated R.R. for purposes of the Competency Motion, *see* Cohen Report at 12 (concluding that, "[a]lthough [R.R.] demonstrates possible emotional immaturity and psychological regression under the stress of his legal situation, these factors do not rise to the threshold of incompetence under the legal standard"), and defense expert Dr. Diaz, who prepared a report for purposes of treatment planning, *see* Diaz Report at 5 (observing cognitive abilities at the "borderline level of functioning and intellectual reasoning" and recommending a treatment plan moving forward).[8] The Court considers Dr. Paradis's analysis of R.R's maturity and development "to be the most logical and persuasive of the three expert opinions," *A.O. Juvenile*, 2016 WL 4197597, at *9, because Dr. Paradis is the only expert who evaluated R.R. with the transfer factors in mind. Additionally, the Court agrees with the Government that the Cohen and Diaz Reports warrant "considerably less weight that the testimony of a witness" who "was subject to cross" at the

[8] The parties stipulated to admit the Cohen and Diaz Reports into evidence for purposes of the Transfer Motion and agreed that "the Court should consider them." *See* Tr. Hr'g Tr. at 81:16-24.

Transfer Hearing. Transfer Hr'g. Tr.at 82:3-4. As explained below, Dr. Paradis's findings favor transfer.

**1. Dr. Paradis's Evaluation**

Dr. Paradis has been practicing forensic psychology for "[a]lmost 40 years." Transfer Hr'g Tr. 27:8. She has published 44 times and has been invited to speak about 20 times. *Id.* at 27-28. Dr. Paradis has testified more than 100 times as an expert in forensic psychology and has been retained by both the prosecution and defendants and appointed by numerous courts. *Id.* at 29:4;8-13. In conducting a psychological assessment, Dr. Paradis "review[s] all the relevant documents, records of psychiatric treatment, education, criminal history" and "conduct[s] an evaluation in person." *Id.* at 30:13-15. If possible, she also "administer[s] psychological tests" and "conduct[s] … collateral interviews of someone or more than one person who knows the defendant." *Id.* at 16-18.

Dr. Paradis met with R.R. on March 1, 2025 at MDC. Paradis Report at 2. She testified that a single meeting with R.R. sufficed because his "presentation [was] very obvious," Transfer Hr'g Tr. at 33:24, and because she had "enough other information," *id.* at 34:2, from R.R.'s previous evaluations by Dr. Diaz and psychologists at the MDC and a conversation with his mother. *Id.* at 34:8-12. Dr. Paradis further explained that, in her meeting with R.R., she "had extensive time to observe [R.R's] thought process and whether he was exhibiting genuine symptoms of mental illness." *Id.* at 34:18-20.

Dr. Paradis opined that "there was nothing abnormal about [] [R.R.] in terms of his intellectual abilities or psychological functioning," and that "he really was a typical[] young man." *Id.* at 36:23-25–37:1. Dr. Paradis concluded that R.R. was "malingering"—i.e. "feigning or exaggerating some type of specific symptom for a specific gain," *id.* at 35:2-3—because "[t]he things [R.R] was saying were not consistent with his history" or "genuine psychiatric illness."

*Id.* at 12-13. For example, despite being in normal "classes for someone his age" as a child, *id.* at 39:15, R.R. claimed to be unable to "identify the letter 'A'" or "read a very simple word like 'cat.'" *Id.* at 40:3-4. Dr. Paradis believed that this "extreme" behavior during the evaluation, *id.* at 40:1, made clear that R.R. "wasn't trying to answer the questions correctly." *Id.* at 40:1-2.

As for R.R.'s maturity, Dr. Paradis offered that, rather than "reflecting immaturity, [R.R.'s] history appear[ed] to show a continued disregard for the law." Paradis Report at 11. In that connection, she testified as follows at the Transfer Hearing:

- The offenses alleged in the Superseding Information are "not the kind of crimes that [one] would associate with a very immature impulsive child" when compared to more juvenile crimes such as "shoplifting or jumping the turnstile." Transfer Hr'g Tr. at 45:25–46:1-3.
- Further, R.R's capacity to be "part of a gang" "show[s] the ability to form . . . normal relationships with [] peers." *Id.* at 46:9-12.
- R.R. had reported to Dr. Diaz and Dr. Cohen that [redacted] *Id.* at 56:9-12. She viewed R.R.'s reports to Dr. Cohen, Dr. Diaz, and his mother as "inconsistent," *id.* at 58:7, and as not "consistent with genuine psychotic illness." *Id.* at 60:15.[9]

---

[9] Dr. Cohen offered a different perspective [redacted]

- Dr. Paradis was also asked whether R.R. "ha[ving] three children with two different women" was "a sign of maturity." *Id.* at 61:15-16. She explained that "it is not unusual for a young – [] adolescent of 16 to have these kind of relationships" and that it was "certainly not a sign of immaturity." *Id.* at 61:22-25.

As previously explained with respect to R.R.'s intellectual development, *supra* at 13, Dr. Paradis opined that R.R. "must have passed many, many classes," despite having been "left back once," Transfer Hr'g Tr. at 65:11, because otherwise "he would have been placed in special education." *Id.* at 65:11-13. When asked about R.R.'s prior evaluations at MDC, Dr. Paradis observed that MDC clinicians had described R.R. as "mentally stable," *id.* at 41:14, and that "neither Dr. Cohen [n]or the clinicians at MDC saw evidence of any kind of pervasive developmental disorder." *Id.* at 42:7-8. MDC physician Dr. Lawrence Bryskin's note that R.R. was "intellectually limited, possibly in the borderline range," was not substantiated with "any details about how he reached that conclusion," nor did it reflect any "diagnosis with borderline intellectual functioning." *Id.* at 80:6-14. These findings were not "repeated by other doctors and [were] [not] the impression of all the other doctors." *Id.* at 80:20-21. Moreover, while Dr. Bryskin referenced "pervasive development disorder" "as a possibility," *id.* at 68:10-13, Dr. Paradis clarified that this is "not the same as giving a diagnosis." *Id.* at 68:17.[10] In any event,

---

[redacted] Ultimately, Dr. Cohen concluded that R.R. "demonstrates *possible* emotional immaturity and psychological regression under the stress of his legal situation" but that "these factors d[id] not rise to the threshold of incompetence under the legal standard." *Id.* at 12 (emphasis added).

[10] At the Transfer Hearing, R.R.'s counsel stated that, under the fifth edition of the "Diagnostic and Statistic[al] Manual for mental diseases or disorders," the diagnosis of "pervasive developmental disorder unspecified" would now be considered an "autism spectrum disorder." *Id.* at 68:23-69:6; *see also* 69:8-9 (Dr. Paradis agreeing that "pervasive development disorder ha[d] been re-placed under autism spectrum disorders"). Dr. Paradis clarified, however, that "there [was] no evidence that [R.R.] [had] ever been diagnosed with that." *Id.* at 69:13-14.

Dr. Paradis observed that R.R. "was able to communicate effectively," "had no disorganized thinking," "showed no evidence of . . . inability to communicate," and "communicated what he wanted to communicate." *Id.* at 70:5-8.

In view of the foregoing, R.R.'s present psychological maturity and intellectual development favor transfer.

**A. Response to Past Treatments**

Although R.R. might "never [have] had any meaningful treatment" growing up, Opp. at 10, the record shows that he has had opportunities to access treatment both while on probation for his previous juvenile adjudication and at MDC. Reply at 16; *see C.F.*, 225 F. Supp. 3d at 196 (evaluating "wider range of corrective interventions" "on the premise that such experiences, failed or successful, have potential to shed light on the juvenile's capacity to rehabilitate"); *United States v. Juv. Male*, No. 12 Cr. 317 JFB, 2012 WL 6043271, at *10 (E.D.N.Y. Dec. 3, 2012) (*Juvenile Male 2012 II*) (considering that in juvenile detention treatment facility, the "defendant attended school and participated in both individual counseling and group therapy sessions" but "quickly returned to his previous behavior" in finding that "response to past treatment" factor weighed "heavily" in favor of transfer), *aff'd sub nom*. *United States v. 2:12-cr-0317-juvenile-male*, 546 F. App'x 24 (2d Cir. 2013).

For example, while on probation, just prior to the time of the instant offenses, R.R. had "access to all of the services the New York City Department of Probation is able to provide, including mentoring programs such as Arches (a mentoring intervention program), weekend programs for young adults ('Youth Wrap'), training and skills programs ('YASC'), and other guidance on education and employment." Reply at 16. R.R. did not participate in any of those programs. *Id.*

In addition, at MDC, R.R. was seen by MDC psychologists on many occasions. He was placed on suicide watch three times and assessed by psychologists for suicide risk. Def. Ex. D (MDC Medical Records). On December 17, 2023, according to Dr. Salman Ibrahim, R.R. expressed that he wanted to return to suicide watch "to be alone," and "it was likely that R.R. was reporting suicidal ideation for secondary gain." *Id.* at 34; *id.* at 120 (Dr. G. Steinhaus noting on August 26, 2024 that R.R. attributed suicidal statements to "his frustration with staff, difficulties managing his anger, and difficulties adjusting to incarceration/the Special Housing Unit, and also presented as attempting to alter the conditions of his confinement (i.e., be housed alone)"). Dr. Ibrahim also recorded that R.R. "did not report any history of mental health illness concerns as he refused to engage with [the psychologist] during th[e] evaluation." *Id.* at 37. In any event, while on suicide watch, R.R. received "daily mental health treatment." *Id.* at 48. On May 18, 2024, Dr. M. Branco at MDC observed that R.R. showed "no significant level of functional impairment associated with mental illness" and "demonstrate[d] no need for regular mental health intervention." *Id.* at 130. He also noted that R.R. was diagnosed with "adjustment disorders, for depressed mood" and "prescribed Zoloft and Remeron." *Id.* Dr. Steinhaus's notes from August 26, 2024 further reflect that, while R.R. had previously been "diagnosed with Adjustment Disorder With Depressed Mood [in December 2023] due to this being his first incarceration," that was now considered "Resolved." *Id.* at 120. R.R. was also "advised how to request psychological services should the need arise in the future." *Id.* As of March 5, 2025, Dr. Ibrahim at MDC noted "no significant mental health issues." *Id.* at 119.

Although R.R.'s diagnosis of "Adjustment Disorder With Depressed Mood" in December 2023 was considered "Resolved" as of August 26, 2024, Def. Ex. D at 120, "that initial progress does not support a finding that there is any likelihood that [he] will not pose a danger to society if h[is] case were adjudicated in the juvenile system." *Juvenile Female*, 581 F. Supp. 3d at 499.

Indeed, as described *supra* at 11-12, R.R. has continued to demonstrate, as recently as a few days before the Competency Hearing, "a continuing, deliberate pattern of armed violence, even inside a federal correctional facility, under daily supervision, and facing this very transfer motion [] before the Court [] now." Transfer Hr'g Tr. at 18:6-9; *see Juvenile Female*, 581 F. Supp. 3d at 500 (finding past treatment less effective and transferring juvenile to adult status where the defendant had "committed two disciplinary infractions" after being detained); *cf. C.F.*, 225 F. Supp. 3d at 197 (determining that past treatment factor weighed against transfer where "C.F. ha[d] not incurred any disciplinary infractions at Sojourn since his juvenile detention [ ] beg[a]n").

Further, as Dr. Paradis explained, "most likely someone with [R.R.'s] history, with this persistent pattern, would need significant treatment over a long period of time," which would only be effective "if they were [also] motivated to change." *Id.* 51:14-17. But Dr. Paradis "didn't see anything in the records that show that [R.R.] was asking for treatment or asking for counseling," Transfer Hr'g Tr. at 49:1-3, nor did she "see any evidence that he's taking advantage of what is available at [MDC] in order to turn his life around." *Id.* at 51:22-25. The Second Circuit has made clear that "a glimmer of hope in future treatment, standing alone, would be insufficient to warrant a finding that rehabilitation is likely." *Nelson I*, 68 F.3d at 590 (rejecting the district court's endorsement of the "glimmer of hope" test to assess "the prospects of rehabilitation with the review of [defendant's] response to past treatment efforts"); *see Juvenile Male 2012 II*, 2012 WL 6043271, at *10 (transferring juvenile to adult status where "it [wa]s likely that any efforts to rehabilitate him at this point would be futile or, at the very least, would involve a long-term rehabilitative effort well beyond five years"). "[T]he Court has serious doubts that treatment . . . could sufficiently rehabilitate the defendant such that he could be released into society in only a few short years, particularly given the heinous and callous

nature of the crimes alleged here." *Juvenile Male No. 2*, 761 F. Supp. 2d at 45 (weighing the past treatments factor in favor of transfer where the prospect of rehabilitation even with treatment was "at best, remote in the extreme"). "In sum, because the defendant has refused to commit to ongoing mental health treatment and there are other indicators that there are impediments to rehabilitation (especially in the short term), including disciplinary infractions, the Court finds that this factor weighs in favor of transfer." *Juvenile Female*, 581 F. Supp. 3d at 501.

**B. Availability of Programs to Treat Behavioral Problems**

"For the government to carry its burden of persuasion, it must, of course, do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. The Government was required to "make a showing" that it had "investigated various options but [wa]s still unable to find a suitable and available program." *Id*. Here, "[n]either the government nor defense counsel provides any details regarding any contract facilities in New York or elsewhere that would be available to someone the defendant's age." *United States v. Male*, 610 F. Supp. 3d 474, 493 (E.D.N.Y. 2022).

The Government primarily argues that, "[b]ecause the defendant is already 21 years old, it is unlikely that he will be sent to a juvenile facility." Reply at 18. The Government further contends that, in any case, "there are no available programs that will cause the defendant to turn over a new leaf within just a few years." Reply at 11; *see id.* at 18 (also maintaining that R.R.'s "track record shows that he is entirely uninterested in taking advantage of any help the Bureau has to offer him"). The Government does not meet its burden, however, where it "simply assert[s] that since defendant is now 21 years of age he is ineligible to participate in any juvenile rehabilitation programs." *United States v. Doe No. 3*, 113 F. Supp. 2d 604, 609 (S.D.N.Y. 2000).

"Accordingly, the Court finds that the government has not met its burden on this factor and that this factor weighs against transfer." *Juvenile Female*, 581 F. Supp. 3d at 501 (not crediting government's assertion that "there are no federal facilities for individuals adjudicated as juveniles" without having considered possible state juvenile facilities). The Court does not find, however, that this factor outweighs factors one through five, "which, in combination, overwhelmingly favor transfer." *A.O.*, 2016 WL 4197597, at *11.

"[R]ehabilitation is a primary purpose of the federal delinquency provisions," and "the government has demonstrated by a preponderance of the evidence that rehabilitation is not likely in this case." *Doe I*, 74 F. Supp. 2d at 321; *see also Nelson II*, 90 F.3d at 641 ("[B]ecause of [defendant's] age at the time of the offense and now, the heinous nature of the offense, and the extent of his post-offense record," the district court properly found that "it is not 'likely' that [defendant] would be rehabilitated.") (internal quotations and citations omitted).

**CONCLUSION**

"For the reasons set forth above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of [R.R.] to adult status" with respect to all of Counts in the Superseding Information "is in the interest of justice." *A.O. Juvenile*, 2016 WL 4197597, at *11. Accordingly, the Government's motion to transfer R.R. to adult status is GRANTED.

SO ORDERED.

Dated: December 19, 2025
New York, New York

Jennifer H. Rearden
JENNIFER H. REARDEN
United States District Judge